IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETROCHOICE LLC, | |
|       Plaintiff, | Case No. 22-cv-02347 |
|   v. | Judge Jorge L. Alonso |
| JOSH J. AMHERDT, | |
|       Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, PetroChoice LLC ("PetroChoice"), brings a seven-count complaint against Defendant Josh J. Amherdt ("Amherdt") for: (I) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*; (II) misappropriation of trade secrets under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*; (III) breach of contract; (IV) unjust enrichment; (V) tortious interference with business advantage; (VI) injunctive relief; and (VII) judicial reformation of contract. PetroChoice's claims stem from Amherdt's 26 years of employment with PetroChoice as a bulk fuel salesman in Illinois and Indiana and subsequent new employment with Blu Petroleum, Inc. ("BP"). Defendant moves to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court grants in part Defendant's motion.

I.     **Background**

The following facts come from Plaintiff's amended complaint, and the Court assumes Plaintiff's factual allegations are true for purposes of this motion to dismiss. *See United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016).

PetroChoice is a distributor of lubricants and services in 32 states. It provides a range of petroleum products across the industrial, commercial and passenger vehicle customer segments, including its own licensed proprietary brands. (Am. Compl. ¶ 19, ECF No. 2-2.) It distributes fuel products in Alabama, Illinois, Indiana, Michigan and Florida. It depends on close client relationships, proprietary sales tactics, confidential pricing schedules, and exclusive buying patterns. It provides national training to its sales employees with respect to selling PetroChoice's specific fuels and lubricants.

Amherdt was one such employee. In 1995, he began working as a Fuel Sales Representative for PetroChoice, a client-facing position selling PetroChoice lubricants and fuels. In that role, Amherdt had access to, and was authorized to use, confidential information and documents, including proprietary knowledge of PetroChoice's customer relationships, pricing schedules and strategies, compensation structures, profit/loss figures, profit margins, proprietary marketing strategies and sales tactics, and supply and logistics information that would be valuable to PetroChoice's competitors if disclosed ("PetroChoice Information"). (*Id*. ¶¶ 30, 61 and 76.)

PetroChoice issued a handbook ("Handbook") to Amherdt that set forth the importance to PetroChoice of the confidential information and trade secrets and of protecting that information. For example, the Handbook required associates to "[m]aintain the confidentiality of PetroChoice trade secrets and propriety or confidential information" and defined trade secrets to include "information regarding the development of systems, processes, products, know-how and technology." (*Id*. ¶ 34.c.) Amherdt additionally signed an agreement ("Agreement") in exchange for a $1,000 bonus and continued at-will employment. (*Id*. ¶ 37.) The Agreement includes a non-compete provision and a confidentiality provision.

At all times, PetroChoice restricts access to certain facilities to protect confidential information, including by: maintaining locked file cabinets and limited access areas; employing password protection on critical computers and giving the passwords to only designated employees on an as-needed basis; maintaining private networks to insulate from intellectual property theft; and prohibiting personal use of its computers. (*Id*. ¶¶ 56-60.) All visitors must be accompanied by an authorized associate and are not allowed in confidential areas. (*Id*. ¶ 56.)

On February 18, 2022, Amherdt advised PetroChoice that he was taking a position with BP in its fuel sales department in Illinois. Amherdt's employment with PetroChoice terminated on February 28, 2022. PetroChoice alleges that Amherdt "mentally retains information related to" the PetroChoice Information. (*Id*. ¶ 62.) On Amherdt's last day, he called and solicited PetroChoice's truck drivers, with whom Amherdt has a relationship.

PetroChoice alleges that it and BP compete for the same market share and that they serve customers with the same fuel and lubricant products in the same geographical markets. PetroChoice alleges that Amherdt "cannot help but draw on his mentally retained" PetroChoice Information in his role at BP (*id*. ¶ 78), and that "PetroChoice cannot expect Amherdt to simply forget what he knows and relied upon daily at PetroChoice's exit door" (*id*. ¶ 79).

On March 16, 2022, PetroChoice filed a seven-count complaint against Amherdt in the Circuit Court of Kane County. It filed its amended complaint—the current operative complaint—on April 20, 2022. Amherdt removed the case to this Court on May 4, 2022, asserting federal question jurisdiction over the DTSA claim under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 over the ITSA, breach of contract, unjust enrichment, tortious interference with business advantage, injunctive relief, and judicial reformation of contract

3

claims. Amherdt does not rely on diversity jurisdiction as the basis for subject matter jurisdiction.[1]

## II. Legal Standard

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alteration marks omitted). Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

---

[1] Neither the amended complaint (ECF No. 2-2), nor the notice of removal (ECF No. 2), identify a basis for diversity jurisdiction because they do not set forth the citizenship of each of PetroChoice's members or the amount in controversy. *See* 28 U.S.C. § 1441; 28 U.S.C. § 1332(a); *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007).

### III. Discussion

Amherdt argues that all claims should be dismissed for various reasons. Because the DTSA is the only jurisdictional hook for proceeding in federal court, before addressing any other arguments for dismissal, the Court considers whether PetroChoice has adequately alleged a DTSA claim.

### A. DTSA Claim (Count One)

The DTSA permits the "owner of a trade secret that is misappropriated" to "bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "Because the DTSA, enacted in 2016, closely tracks the ITSA, the Court looks to the ITSA for guidance." *Busey Bank v. Turney*, No. 21 C 2900, 2022 WL 92940, at *5 (N.D. Ill. Jan. 10, 2022). Similar to the DTSA, the ITSA authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets. 765 ILCS 1065/3. "[F]or both . . . DTSA and ITSA claims, [Plaintiff] must allege that (1) there are trade secrets (2) that Defendants misappropriated." *Aon plc v. Infinite Equity, Inc.,* No. 19-CV-07504, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021).

> A "trade secret" under the DTSA is defined as:
>
> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

"Improper means" under the DTSA:

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

18 U.S.C. § 1839(6).

"Misappropriation" is defined as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied consent by a person who--
    (i) used improper means to acquire knowledge of the trade secret;
    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
        (I) derived from or through a person who had used improper means to acquire the trade secret;
        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
    (iii) before a material change of the position of the person, knew or had reason to know that--
        (I) the trade secret was a trade secret; and
        (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

First, Amherdt argues that PetroChoice fails to identify any trade secrets with sufficient detail. "The existence of a trade secret ordinarily is a question of fact." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). Trade secrets "need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *AutoMed Techs.,*

6

*Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (citation and internal quotation marks omitted). "Whether a plaintiff adequately alleges the existence of a trade secret is a fact intensive analysis, but courts have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014); *see also Meyer Tech. Sols., LLC v. Kaegem Corp.*, No. 17 C 281, 2017 WL 4512918, at *2 (N.D. Ill. Oct. 10, 2017).

The amended complaint alleges that the PetroChoice Information—the alleged trade secrets—includes proprietary knowledge of PetroChoice's customer relationships, pricing schedules and strategies, compensation structures, profit/loss figures, profit margins, proprietary marketing strategies and sales tactics, and supply and logistics information that would be valuable to PetroChoice's competitors if disclosed. (ECF No. 2-2 at ¶¶ 30, 61 and 76.) These allegations suffice at the motion to dismiss stage to establish legally cognizable trade secrets. *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information." (quotation and internal punctuation omitted)); *Covenant Aviation Sec.*, 15 F. Supp. 3d at 818 (finding "profit and loss information, internal costs and overhead, operational information as related to San Francisco and other facilities throughout the country, and specific bid and proposal information related to San Francisco and other airports" alleged trade secrets with sufficient specificity); *cf. RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (finding customer lists, historical sales information, details of pending sales quotations, year-to-date sales figures, and shipping, pricing, cost and profit margin information to warrant trade secret protection).

Second, Amherdt argues that PetroChoice fails to specify how the PetroChoice Information is sufficiently secret such that PetroChoice derives independent economic value from its secrecy. For information to be a "trade secret" under the DTSA, the owner must have "taken reasonable measures to keep such information secret[.]" 18 U.S.C. § 1839(3).

The amended complaint outlines the efforts that PetroChoice takes to maintain the secrecy of its confidential information and trade secrets, including by having Amherdt sign the Agreement, among other things. (ECF No. 2-2 at ¶¶ 37-60.) At the pleadings stage, PetroChoice's allegations regarding secrecy are sufficient. *See Aspen Mktg. Servs., Inc. v. Russell*, No. 09 C 2864, 2009 WL 4674061, at *8 (N.D. Ill. Dec. 3, 2009) (finding sufficient plaintiff's allegations that "its information is kept secret through restricting access to such information and requiring employees to sign restrictive covenants in their employment contracts, among other means").

Third, Amherdt argues that the amended complaint fails to adequately plead misappropriation because it does not sufficiently allege that Amherdt improperly acquired, disclosed, or used a trade secret. The Court agrees. "Misappropriation can be shown one of three ways—by improper acquisition, unauthorized disclosure, or unauthorized use." *Covenant Aviation Sec.*, 15 F. Supp. 3d at 819 (quoting *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (2005)). PetroChoice does not allege facts showing improper acquisition. To the contrary, PetroChoice alleges that Amherdt acquired, and was authorized to use, the PetroChoice Information while performing his official duties while employed by PetroChoice. (ECF 2-2 at ¶¶ 30 and 61.) That leaves only unauthorized disclosure or unauthorized use.

PetroChoice attempts to plead threatened, rather than actual, unauthorized disclosure or use. *See* 18 U.S.C. § 1836(b)(3) and 765 ILCS 1065/3(a). PetroChoice relies upon the "inevitable

8

disclosure" doctrine, by which "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).[2] "Courts examine three factors in an inevitable disclosure analysis: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets." *Packaging Corp. of Am.*, 419 F. Supp. 3d at 1070 (citing *PepsiCo v. Redmond*, No. 94-CV-06838, 1996 WL 3965 at *20 (N.D. Ill. 1996)).

However, "[t]he mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information[.]" *PepsiCo*, 54 F.3d at 1269 (quotation and internal punctuation omitted). Stating a claim for inevitable disclosure "requires more than just the employer's fear that the employee will use the trade secrets, but a showing of intent or a high probability the employee will use them." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011) (citing *PepsiCo.*, 54 F.3d at 1268-69). *See also Packaging Corp. of Am.*, 419 F. Supp. 3d at 1070 (same). "Courts are 'cautious' in their application of the doctrine due to its significant potential to curb employee movement among competitors." *Packaging Corp. of Am.*, 419 F. Supp. 3d at 1070 (quoting *Triumph Packaging Group v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011)). "Plaintiffs that have succeeded in stating claims for inevitable disclosure in this district have alleged that the

---

[2] Although the Seventh Circuit has permitted inevitable disclosure claims under the ITSA, it has not explicitly allowed them under the DTSA. Other courts in this district, however, have analyzed inevitable disclosure under both laws, which suggests that the doctrine is available in either context. *See, e.g.*, *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 (N.D. Ill. 2020); *Indus. Packaging Supplies, Inc. v. Channell*, No. 18 CV 165, 2018 WL 2560993, at *3 (N.D. Ill. June 4, 2018); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 1:16-CV-03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017).

defendant 'could not operate or function' in the new position without relying on the trade secrets." *Id*. at 1070 (quoting *Strata Marketing, Inc. v. Murphy*, 740 N.E.2d 1166, 1179 (2000)) (listing cases).

PetroChoice adequately alleges the first two factors of the test: PetroChoice and BP are direct competitors in fuel and lubricant products in the same geographical market (ECF No. 2-2 at ¶¶ 71-74), and Amherdt's new and former positions both involve sales of the same type of product—fuels and lubricants (*id*. ¶¶ 70 and 79). PetroChoice does not make any allegations about whether BP has taken any actions to prevent use or disclosure of PetroChoice Information. But even putting that factor aside, PetroChoice fails to state a claim because it fails to allege intent to use or a high probability of use of trade secrets, or that Amherdt could not operate or function in his new position at BP without relying on the trade secrets, particularly in light of the skepticism other courts in this district have shown toward the inevitability doctrine.

PetroChoice alleges that Amherdt "cannot help but draw on his mentally retained" PetroChoice Information in his role at BP (*id*. ¶ 78), and that "PetroChoice cannot expect Amherdt to simply forget what he knows and relied upon daily at PetroChoice's exit door." (*Id*. ¶ 79.) Even if the Court assumes Amherdt's possession of the PetroChoice Information in his mind, "mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets[.]" *Packaging Corp. of Am.*, 419 F. Supp. 3d at 1066.[3] *See also Indus. Packaging Supplies*, 2018 WL 2560993 at *2. Amherdt "could avoid using [PetroChoice's] trade

---

[3] This is so "even when considered in conjunction with solicitations of former clients." *Packaging Corp. of Am.*, 419 F. Supp. 3d at 1066. Of course, the amended complaint does not allege that Amherdt has solicited former or current clients. It only alleges that on his last day, Amherdt called and solicited truck drivers (*id*. ¶ 80), and on information and belief Amherdt is soliciting PetroChoice employees to BP (*id*. ¶ 82). It does not, however, allege that Amherdt used or disclosed, or will inevitably use or disclose, trade secrets when attempting to solicit PetroChoice truck drivers or employees.

10

secrets by simply not targeting [its] clients and not using its proprietary designs, products, or processes." *Indus. Packaging Supplies*, 2018 WL 2560993 at *3 (citation omitted).

It is telling that PetroChoice alleges that Amherdt's role at BP "will require him to perform his sales skills at the level he previously owed PetroChoice resulting in inevitable disclosure." (ECF No. 2-2 at 14.) Amherdt's "level" of performance of his "sales skills" is precisely the sort of sales acumen that employees are permitted to take with them. *Saban*, 780 F. Supp. 2d at 734 ("[C]ourts must recognize the employee's right to make use of general knowledge and skills acquired through experience in pursuing the occupation for which he is best suited." (citation omitted)); *see also Packaging Corp.*, 419 F. Supp. 3d at 1069; *Archer Daniels Midland Co. v. Sinele*, 139 N.E.3d *1036*, 1044 (finding that sales "knowledge and experience … accumulated while working as a salesman" are "things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations, or analyses." (internal punctuation and quotation omitted)).

The cases cited by PetroChoice are distinguishable. In *CZS Holdings LLC v. Kolbe*, the district court found the plaintiff adequately alleged a theory of inevitable disclosure in part because the defendant, who had "never worked in the property eradication business prior to his employment" with plaintiff, "did not just take a comparable position at a competitor[;] [h]e *created* a competing business in the same geographical area he once oversaw while at [plaintiff company]." *CZS Holdings LLC v. Kolbe*, No. 20 C 6886, 2021 WL 1837385, at *4 (N.D. Ill. May 7, 2021) (emphasis original). The court found that "[u]nder these circumstances, unless [defendant] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new business] by relying on his knowledge of [plaintiff's] trade secrets." *Id*. (punctuation omitted) (quoting *PepsiCo*, 54 F.3d at 1269). Further, because

11

defendant created the new business and acted as its CEO, it was "unlikely he has taken steps to prevent himself from disclosing [plaintiff's] trade secrets." *Id*. Here, there are no analogous allegations with respect to Amherdt.

In *Liebert Corp. v. Mazur*, the Illinois appellate court held in the context of a motion for preliminary injunction that a former territory sales manager would inevitably disclose his former employer's trade secrets in his new position with a company that he and his former colleagues started while they were still working for the former employer. *Liebert*, 827 N.E.2d at 926-27. The court held that the former employee misappropriated trade secrets through improper acquisition—namely, downloading 40 banker boxes' worth of the former employer's confidential information, including trade secrets, and intentionally deleting the application log that would have shown definitively whether he burned the confidential information to a CD. *Id*. The appellate court applied an adverse inference presumption given that he destroyed relevant evidence. *Id*. at 928-29. Again, there are no analogous allegations with respect to Amherdt.

The district court in *Mickey's Linen v. Fischer* found in the context of deciding a motion for preliminary injunction that the defendant would inevitably use or disclose plaintiff's trade secrets in his employment with a competitor. *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *13 (N.D. Ill. Sept. 8, 2017). Notably, the court found in part that there was "substantial circumstantial evidence that [defendant] already improperly acquired and used [plaintiff's] trade secrets, [and] that there is a high probability that he will do so again in the future[.]" *Id*. As in *Liebert*, the court applied an adverse inference presumption to the evidence

12

that defendant wiped his company cellphone and found it significant that he offered to solicit one of the plaintiff's customers for his new employer. *Id.*[4]

Here, by contrast, "[a]ll that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough." *PepsiCo*, 54 F.3d at 1268–69 (quoting *Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989)). Without more, PetroChoice cannot proceed on its DTSA claim, which the Court dismisses without prejudice.[5]

### B. Supplemental State Law Claims

PetroChoice also brings numerous state law claims against Amherdt, which it contends that the Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367. But because the Court dismisses the DTSA claim over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over PetroChoice's state law claims. *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly &* Co., 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). The Court, therefore, dismisses the state law claims against Amherdt without prejudice and defers consideration of Amherdt's arguments for dismissal of these claims until PetroChoice adequately alleges a basis for the Court's subject matter jurisdiction.

---

[4] In the final case cited by plaintiff, the Illinois appellate court in fact reversed the lower court's granting of preliminary injunction based on a theory of inevitable disclosure. *Archer Daniels*, 139 N.E.3d at 1046. There, as here, the plaintiff company did not allege that upon leaving, defendant "took with him anything other than his unaided memory." *Id*. at 1045.
[5] Because DTSA and ITSA claims follow the same analysis, PetroChoice's ITSA claim also fails to state a claim.

IV.    **Conclusion**

        For the reasons discussed, the Court grants in part defendant's motion to dismiss [8]. The Court dismisses the amended complaint without prejudice and defers consideration of the state law claims until PetroChoice pleads a sufficient basis for subject matter jurisdiction. Because the dismissal is without prejudice, the Court grants PetroChoice until March 21, 2023 to file an amended complaint.

**SO ORDERED.**                                      **ENTERED: February 21, 2023**

                                                                    **HON. JORGE ALONSO**
                                                                    **United States District Judge**